# UNITED STATES DISTRICT COURT

for the
Southern District of California

2017 SEP -6 PM 4: 47

FILED

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

SCG FOR
A. AHUMADA
9/6/17

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone S Cellphone,<br>Model Number: A1686,<br>FCC ID: BCGE2944A | )<br>)<br>)  Case No.<br>)<br>)  '17MJ8941<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated herein)

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841, 846, 952, 960, & 963 | Importation of Controlled Substance, Conspiracy to Import Controlled Substance, Possession with Intent to Distribute, Conspiracy to Possess Controlled Substance with Intent to Distribute |

The application is based on these facts:
See attached affidavit of Homeland Security Investigations (HSI) Special Agent Brian M. Quigg

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brian M. Quigg, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-6-2017 @ 4:00 p.m.

City and state: El Centro, California

Hon. Peter C. Lewis, U.S. Magistrate Judge
*Printed name and title*

*Search Warrant*
*Attachment A*
*HARMON Phone*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

**Apple iPhone S Cellphone,**

Model Number: A1686,

FCC ID: BCGE2944A

**Target Telephone 1** is currently in the possession of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, 2051 N. Waterman Ave., El Centro, California 92243.

*Search Warrant*
*Attachment B*
*Harmon Phone*

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search **Target Telephone 1** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Telephone 1**. The seizure and search of **Target Telephone 1** will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Telephone 1** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of March 1, 2017 to July 11, 2017:

a. tending to identify attempts to import from Mexico into the United States and/or distribute methamphetamine, heroin, or some other controlled substance;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling and the distribution of methamphetamine, heroin, or some other controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling and/or distribution of methamphetamine, heroin, or some other controlled substance from Mexico into the United States and within the United States;

d. tending to identify travel to or presence at locations involved in the smuggling of methamphetamine, heroin, or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, **Target Telephone 1**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Section 841, 846, 952, 960, and 963**. The seizure and search of **Target Telephone 1** shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phone(s) may be searched for the evidence above.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF

iPhone S Cellular Phone
Model Number: A1686
FCC ID: BCGE2944A

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Brian M. Quigg, Special Agent with the United States Department of Homeland Security ("DHS"), Homeland Security Investigation ("HSI"), having been duly sworn, state as follows:

## INTRODUCTION

1. This affidavit supports an application to search the following target property: One Apple iPhone S Cellphone, Model Number: A1686, FCC ID: BCGE2944A (hereinafter "**Target Telephone 1**") seized from Tamara Harmon (hereinafter "Tamara HARMON") as more particularly described in Attachment A

2. **Target Telephone 1** was seized from Tamara HARMON on or about July 11, 2017, at about the time of her arrest. It is believed that **Target Telephone 1** was used by Tamara HARMON to communicate with co-conspirators during a drug smuggling event on July 11, 2017. Tamara HARMON has been charged with Conspiracy to Distribute Methamphetamine and Conspiracy to Distribute Heroin in the Southern District of California. Probable cause exists to believe that **Target Telephone 1** contains evidence relating to violation of Title 21, United States Code, Sections 841, 846, 952, 960, and 963. **Target Telephone 1** is currently in the possession of the Department of Homeland Security, Homeland Security Investigations, Assistant Special Agent in Charge, located

in El Centro, California. Based on the information below, there is probable cause to believe that a search of **Target Telephone 1** will produce evidence of the aforementioned crimes, as described in Attachment B.

3. This affidavit is based on information I have gained through training and experience, as well as upon information related to me by other individuals, including law enforcement officers. In preparation of this affidavit, I have discussed the facts of this case with other law enforcement agents and officers, within the Drug Enforcement Administration, the United States Border Patrol, and the Department of Homeland Security. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation but have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence relating to violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963, described in Attachment B, is located on the cellular telephone described in Attachment A.

## EXPERIENCE AND TRAINING

4. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am currently assigned to the Imperial Valley Border Enforcement Security Task Force.

5. I have been employed as a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) since November 2010. I am currently assigned to the Border Enforcement Task Force (BEST). My prior assignments have been two and a half years assigned to the Imperial County Narcotics Task Force (ICNTF), seventeen months in HSI Narcotics Group 2 and one year in the HSI Administrative Services Group.

2

6. I have completed 23 weeks of intensive training in criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia (2011). As a result of my training and experience as a Special Agent, I am aware of the methods utilized in the sales of controlled, distribution, transportation, and concealment, of illegal controlled substances.

7. I am a graduate of a state/local police academy in 2001. I have previously served as a police officer with the Massachusetts Transportation Authority Transit Police Department in Massachusetts with a total of ten years of service. Five of those ten years I served as a Detective working multiple criminal investigations. I also served five years in the United States Marine Corps.

8. I have participated in and led investigations targeting individuals involved in narcotics trafficking from street-level dealers, to mid-level distributors, to the command and control elements of Mexico-based cartels. I have worked and consulted with numerous special agents and other law enforcement officers who have investigated narcotics trafficking throughout the United States. From my training, experience, and knowledge gained from conversations with other law enforcement officers, I have become familiar with the techniques and methods used by drug trafficking organizations.

9. I have led and participated in investigations involving the use of electronic surveillance techniques to include, but not limited, court-authorized wire intercepts, video surveillance, global positioning satellite ("GPS") trackers, and body-worn monitoring devices. These investigations have included violations of statutes listed under Titles 18, 21, and 31 of the United States Code as well as violations under California state law. As a result of these investigations, I have reviewed conversations of dozens of individuals involved in narcotics trafficking. As a result, I have become familiar with the methods used by those involved in narcotics trafficking to avoid detection by law enforcement as well as their use of electronic devices to communicate with co-conspirators.

3

10. Based on my experience, I am familiar with the methods used in the sales distribution, transportation, and concealment, of illegal controlled substances. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of individuals involved in the sales of controlled substances.

11. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth, I submit the following:

   a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages;

   b. Drug smugglers believe that cellular telephones provide greater insulation against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephones.

   c. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   d. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at a predetermined destination.

   e. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and

     posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

 f. The use of cellular telephones by drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know bases on my training, education, experience investigating narcotics traffickers that searches of cellular/mobile telephones yields evidence:

 a. tending to identify attempts to import from Mexico into the United States and/or distribute methamphetamine, heroin, or some other federally controlled substance;

 b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States;

 c. tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States;

 d. tending to identify travel to or presence at locations involved in the smuggling of methamphetamine, heroin, or some other federally controlled substance from

Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## STATEMENT OF PROBABLE CAUSE

14. Tamara HARMON came to HSI's attention after her husband, Shawn Bradley Harmon, was identified as a drug trafficker by an individual who claimed Shawn Harmon sent packages of drugs through shippers to Ohio in December 2016. The individual admitted to being a body carrier of methamphetamine from Mexico and into the United States for Shawn Harmon.[1]

15. As a result of the individual's information, HSI and the Imperial County Narcotics Task Force (ICNTF) began to investigate Shawn Harmon. In March 2017, HSI and ICNTF developed sufficient probable cause to obtain a California state search warrant of Shawn Harmon's motel room, located at 2354 South 4th Street Room 607, El Centro, California. Tamara HARMON was also living in that motel room. The search warrant was executed on March 7, 2017. When they executed the search warrant, law enforcement uncovered 1.7 pounds of methamphetamine and 74.7 grams of heroin. The search also revealed what appeared to be a narcotics packaging operation, including little

---

[1] The individual became an informal informant after he was caught smoking methamphetamine by Border Patrol Agents at the Golden Acorn Casino. The individual's motivation was to avoid charges against him if packages in his name were intercepted. The individual stopped providing information in March 2017 after Shawn Harmon was arrested and made jail calls during which he stated that the individual might be responsible for providing information to the government. The individual never received any payments for the information he provided.

The individual has the following criminal history: a felony conviction for California Health & Safety Code Section 11350 in 1989, a felony conviction for California Health & Safety Code Section 11351 Possession of Narcotics for Sale in 1991, a felony conviction for 21 USC 952 and 960, Importation of a Controlled Substance in 2000, a misdemeanor conviction for California Penal Code 594 vandalism in 2006, a misdemeanor conviction for California Penal Code 243 Simple Battery in 2007, a misdemeanor conviction for California Vehicle Code 4462.5 Failure to Provide Name to Officer in 2007, a felony conviction for California Penal Code 496 (A) Receiving Stolen Property in 2009, a felony conviction for California Penal Code 496 (A) Receiving Stolen Property in 2013, a felony conviction for California Penal Code 496 (A) Receiving Stolen Property in 2014, and a felony conviction for California Health & Safety Code Section 11350 in 2014.

zip lock baggies, some of which contained marijuana and methamphetamine. In addition, 103 syringes were found in the room. Shawn Harmon and another individual, Timothy Corbett were arrested. Tamara HARMON was present at the motel room and was detained as the search warrant was executed.

16. After the search warrant for the motel room was executed, Tamara HARMON was read her rights per Miranda. She admitted that her husband had a drug problem but claimed that she was unaware of him distributing controlled substances. Shawn Harmon and Corbett were also interviewed and arrested for possession of methamphetamine and Heroin, Possession of methamphetamine and heroin for sales and possession of drug paraphernalia. On April 27, 2017 Shawn HARMON and CORBETT were convicted of Possession, Possession for Sale, and Transportation of Narcotics. Shawn Harmon and Timothy CORBETT were sentenced to 5 years at State Prison (suspended).

17. HSI continued its investigation into Shawn Harmon. On May 2, 2017, Shawn Harmon entered a UPS store in El Centro, paid to mail a package, kept another package with him, and stated that he was going to send that package through another shipper. The UPS employee became suspicious and reported the incident to local law enforcement. El Centro Police Department responded to the UPS Store and brought a drug detecting K-9. They ran the K-9 around the package Shawn Harmon had dropped off, and the K-9 alerted to the package. They then obtained a California state search warrant for the package, opened it, and found methamphetamine and marijuana inside the package.

18. On May 11, 2017, the Indianapolis Metropolitan Police Department reported intercepting four packages containing methamphetamine, marijuana, and heroin associated with Shawn Harmon. The packages contained a total of 1.56 kilograms of methamphetamine, 40 grams of heroin, and 38 grams of marijuana. Three of the four packages stated that (1) the sender was Shawn Harmon, Shawn H., or S. Harmon and (2) had a return address of 215 N. Imperial Avenue El Centro, California. The one package that lacked a return sender had a package labeled "C-Low," the same label that one of the smaller packages contained in the package sent by "Shawn H." at 215 N. Imperial

7

Avenue El Centro, California also had. As of this date Shawn HARMON is wanted by Imperial County Probation Department for failure to comply with the conditions of his release. .

19. As Shawn Harmon was in violation of his probation conditions a probation hold for him had been issued, HSI was attempting to find and arrest Shawn Harmon. In an attempt to find Shawn Harmon, HSI was conducting surveillance on his wife Tamara HARMON. HSI believed that Shawn Harmon was still involved in drug trafficking while out on probation. HSI placed a TECS alert on Tamara HARMON so that they could follow her as she entered the United States from Mexico. Prior to the date of her arrest, HSI had attempted to follow Tamara HARMON unsuccessfully three times.

20. On July 11, 2017, at approximately 4:30 p.m., HSI Special Agents conducting surveillance at the pedestrian exit to the Calexico, California West Port of Entry observed Tamara HARMON exiting the Port of Entry. HSI Special Agents also observed Tamara HARMON talking to someone on **Target Telephone 1**. Soon after, Tamara HARMON was picked up by a white Dodge Caravan driven by a female later identified as Christina Lambert.

21. Lambert then drove through the city of Calexico and stopped at the Amigo Mini-Storage Facility located at 2360 Portico Boulevard, Calexico, California. Approximately five minutes later, the Dodge Caravan exited the storage facility and both Tamara HARMON and Lambert proceeded north on Highway 111 toward El Centro, California.

22. Once in El Centro, California, HSI Special Agents observed the Dodge Caravan parked on Main Streets in front of the UPS shipping facility located at 160 Main Street in El Centro. They observed Tamara HARMON exit the UPS Store and re-enter the Dodge Caravan. They entered soon after Tamara HARMON had exited and requested that UPS employees detain any packages dropped off by Tamara HARMON. A UPS manager provided HSI Special Agents with a brown cardboard box and the front counter employees confirmed it was the same box Tamara HARMON dropped off.

23. Imperial Police K-9 Officer M. Sheffield and his assigned drug narcotic detection dog responded to the UPS location to perform a scan of the package. The K-9 alerted to the package. The package was then secured at the HSI Assistant Special Agent in Charge (ASAC) Office in El Centro while a search warrant was obtained.

24. At approximately 6:30 p.m., Tamara HARMON and Lambert were stopped and detained pending investigation. Tamara HARMON was in possession of **Target Telephone 1** at the time of her detention. At approximately 11:00 p.m., agents received a signed California State Search Warrant to search the parcel. The contents of the parcel were found to contain 290 grams of a substance that tested positive for methamphetamine and 39 grams of a substance that tested positive for heroin.

25. Tamara HARMON was read her rights per Miranda. Tamara HARMON acknowledged her rights and agreed to answer questions without the presence of an attorney. Tamara HARMON admitted knowledge of the narcotics in the parcel and stated other parties had loaded the parcel with the narcotics. Tamara HARMON also admitted that **Target Telephone 1**, which was found in her purse, belonged to her and provided the passcode for the phone.

26. Based upon my experience investigating narcotics smugglers and the particular investigation in this case, I believe that Tamara HARMON likely used **Target Telephone 1** to coordinate the distribution and/or of heroin and methamphetamine into and/or within the United States. For example, I know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement, which requires planning and coordination in the weeks and often months prior to the event. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I therefore believe that information relevant to the narcotics trafficking activities of Tamara HARMON, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information and communications are stored in the memory of **Target**

**Telephone 1**. I further believe that information on **Target Telephone 1** may help identify other persons involved in Tamara HARMON's narcotics trafficking activities.

27. Given this, I respectfully request permission to search the **Target Telephone 1** for items listed in Attachment B beginning on March 1, 2017, up to and including July 11, 2017. The March 1, 2017 start date is appropriate given Tamara HARMON's presence when her husband Shawn Harmon was found in possession of large amount of controlled substances during the execution of a search warrant. The July 11, 2017 end date is appropriate as Tamara HARMON was arrested that evening.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION
## AS TO THE CELLULAR TELEPHONE

28. It is not possible to determine, merely by knowing **Target Telephone 1**'s make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that

have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect **Target Telephone 1** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

31. As Tamara HARMON was observed dropping off a package that later was found to contain controlled substance in combination with her admissions, probable cause exists showing that Tamara HARMON had knowledge of the controlled substances in the package. In addition, as Tamara HARMON was sending a substantial quantity of methamphetamine and heroin a package via UPS to another state, probable cause exists to believe that Tamara HARMON was coordinating with persons known and unknown to import and/or distribute methamphetamine, heroin, or some other controlled substance. Probable cause therefore exists to conclude that Tamara HARMON used **Target Telephone 1** to facilitate the offense of importing and distributing of methamphetamine and heroin. I also believe that probable cause exists to believe that evidence and instrumentalities of illegal activity committed by Tamara HARMON continues to exist on **Target Telephone 1**.

32. Because **Target Telephone 1** was promptly seized during the investigation of Tamara HARMON's trafficking activities and has been securely stored, there is probable

11

cause to believe that evidence of illegal activities committed by Tamara HARMON continues to exist on **Target Telephone 1**.

33. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B are likely to be found in the property to be searched described in Attachment A. Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with Homeland Security Investigations, or another federal law enforcement agent or officer specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Brian M. Quigg
Homeland Security Investigations

SUBSCRIBED and SWORN to me before
This 6th day of September, 2017

_____
HON. PETER C. LEWIS
U.S. MAGISTRATE JUDGE